```
                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
                        SOUTHERN DIVISION


- - - - - - - - - - - - - - -x
                              :
UNITED HEALTHCARE OF          :
FLORIDA, INC., et al,         :
                              :     Civil No.: 17-01787-TDC
          Plaintiffs,         :
                              :
     v.                       :
                              :
AMERICAN RENAL ASSOCIATES     :
HOLDINGS, INC., et al,        :
                              :
          Defendants.         :     August 23, 2017
                              :
- - - - - - - - - - - - - - -x      Greenbelt, Maryland
```

**TELEPHONE CONFERENCE**

           BEFORE:   THE HONORABLE CHARLES B. DAY, Judge

APPEARANCES:              ANNE LOCKNER, Esq.
                          WILL BARNSTEIN, Esq.
                          Robins, Kaplan, Miller and Ciresi LLP
                          2800 LaSalle Plaza
                          800 LaSalle Avenue
                          Minneapolis, MN 55402
                              On Behalf of the Plaintiff

                          CHONG PARK, Esq.
                          Ropes and Gray
                          2099 Pennsylvania Avenue, NW
                          Washington, DC 20006
                              On Behalf of the American
                              Kidney Fund

                          JEFFREY BUSHOFSKY, Esq.
                          TIMOTHY FARRELL, Esq.
                          Ropes and Gray LLP
                          191 N Wacker Drive, 32nd Floor
                          Chicago, IL 60606
                              On Behalf of the American
                              Kidney Fund


Proceedings recorded by electric sound recording, transcript
produced by transcription service.

Audio Operator:          In Chambers

Transcription Company:   CompuScribe
                         5100 Forbes Boulevard
                         Suite 101
                         Lanham, MD 20706
                         (301) 577-5882

1                       P R O C E E D I N G S

2         (Whereupon, at 10:40 a.m., the telephone conference

3   begins.)

4         THE COURT:  -- I think you started a little sooner

5   than I hoped.  So let's -- this is a telephone conference

6   involving United Healthcare versus American Renal, case number

7   17-1787.  This is a pre-discovery motion filing telephone

8   conference call which I am inclined to give some direction to

9   counsel and at least express maybe some leanings on potential

10  discovery problems and hopefully that can keep the potential

11  motions to be filed to a minimum.  But with that said, now if

12  I can ask counsel to identify themselves for the record.

13        MS. LOCKNER:  Thank you, Your Honor, this is Anne

14  Lockner from Robins, Kaplan in Minneapolis along with my

15  colleague Will Barnstein.  I will be representing United

16  Healthcare of Florida and All Savers Insurance Company.

17        THE COURT:  Thank you.

18        MR. PARK:  Good afternoon, Chong Park of Ropes and

19  Gray, on behalf of American Kidney Fund.

20        THE COURT:  Thank you.

21        MR. BUSHOFSKY:  Your Honor, Jeff Bushofsky and Tim

22  Farrell in the Chicago office of Ropes and Gray also

23  representing the American Kidney Fund.

24        THE COURT:  Thank you all.  I trust that we are at a

25  better place.  A lot less vacationing in front of us.  Travel

1  around the world as I recall some folks were doing.  But we do

2  have a limited to plow through a few of the things. I have

3  received and reviewed your submissions and I thank you for

4  them.  Chances are in the future, your submissions will be

5  shall I say a bit  more streamlined.  And since that typically

6  we have a page limitation on the educational materials.

7       Well with that being said, it is my vision at this

8  point to kind of alternate between counsel.  That is giving

9  each of you an opportunity to take on one subject and we will

10 talk through that subject before someone gets to choose

11 another one.  So with that being said, I will start with

12 United Healthcare.  And know that you have a number of

13 categories and subcategories of concern but you get to choose

14 one and we will fully explore that one.

15      MS. LOCKNER:  Thank you, Your Honor.  You know the

16 first one that may make sense to discuss is the time period.

17 It is our position that the time period should be the same as

18 the time period in the Florida case.

19      THE COURT:  Let me interrupt you.  I agree.  I

20 probably should go back to the bull in the ring and see if

21 anyone from the Foundation -- either Mr. Park or Mr. Farrell

22 or Bushofsky has something more meaningful to tell me then

23 what has been lifted from the Florida litigation order, which

24 I read as going back to 2014.  I understand that you want it

25 to be 2016 for some good reasons but I am of the strong belief

1    that often times there needs to be a bit of a lead up to

2    obtaining information as opposed to the date of supposed

3    infraction.

4         Here, I understand that 2016 is really the date in

5    place of some of these people who are allegedly involved in

6    this manifest set forth in the second amended complaint.  But

7    even if that were true, I would personally give him more than

8    2016 but looks like Florida court has said you can go back to

9    2014.  So with that lay of the land, I will hear you on that.

10        MR. BUSHOFSKY:  Your Honor, it is  Jeff Bushofsky

11   for the American Kidney Fund.  First of all let me say as is

12   obvious but I want to accentuate it.  We are not a party.  We

13   didn't sue anyone and we weren't sued by anyone.  And so under

14   the rules, I think that it is fair to come out with a

15   presumption that is sort of a penungle(sic) timing of requests

16   that might be appropriate for a party, not necessarily true

17   for a non-party.  That is one point.

18        Another point is that, as I understand it, the

19   October 2014 start date for the discovery in the Florida

20   litigation was the result of a compromise between the parties

21   in that case.  My client had no input into that discussion.

22   Presumably Ms. Lockner's client was looking for materials

23   going back quite a bit father and I assume that ARA was hoping

24   to give documents for a shorter time period more recently but

25   I wasn't involved with that nor would that have been

1   appropriate.

2          I don't know how that --- was made but we maintained

3   that October 2014 which Ms. Lockner will correct me if I am

4   wrong, I think it is actually the starting date, not 2014

5   which I think we would just assume that that was January 1 or

6   something like that.  I think an ordinary case. We are not

7   sure where that came from at the end of the day.

8          But here is what our position is at AKF.  The

9   alleged fraud involves particular United Healthcare plans and

10  policies on the Obamacare exchanges for the 2016 policy year

11  as I understand it.  And therefore that is what is relevant.

12  This is not just a case about a vague(sic) conspiracy between

13  supposedly dialysis providers and this 50 year old charity

14  that has been helping people long before Obamacare was even

15  you know a gleam in the former President's eyes.

16          It is about particular plans for particular year.

17  And so we could get inappropriate and unduly burdensome to

18  make this charity go back to 2014 to look for things simply

19  because United Healthcare thinks that there might be something

20  out there and there is speculation that there might be

21  something that is relevant and you know, responsive.

22          THE COURT:  Well, I tend to still lean towards

23  United's view on this and I agree with you that we may not

24  know how the sausage was made but I do believe that the

25  Florida court in some way put its signature on the end result

1    being 2014 and I agree with you that it may be October of 2014

2    and not January and we do need to clarify that point.

3              But I also think that as I understand the

4    allegations involved, it is not as if one can rely or believe

5    or assume that any of the alleged conspiratorial acts that is

6    the request for a certain contributions or the receipt of

7    certain contributions and then the outpouring to different

8    patients who then can be reimbursed through United's plan in

9    the 2016 year.

10             I don't think 2016 discovery is going to capture all

11   of that in my small mind.  So again it is just my leaning but

12   that is the hill you are working with.

13             MR. BUSHOFSKY:  Your Honor, in the spirit of

14   compromise -- first of all, we don't think we should produce

15   most of this stuff, we are just talking about dates right now.

16   I will make a representation to the Court that the beginning

17   of the open enrollment period for the policy years that are

18   actually at issue in the case in Florida was October of 2015.

19             My client would consider that as an appropriate

20   starting date because if there was shenanigans that were

21   supposedly happening relevant to the 2016 plan year, then I

22   will concede for purposes of this compromised discussion that

23   there might be something potentially relevant assuming that

24   there is anything relevant -- we will hypothesize that there

25   is, that it could exist in 2015.

1          Making this charity go back to 2014 starting at a

2    time which would be the open enrollment period for the 2015

3    plan year is -- I don't know how that resulted or why that the

4    Court had entered an order with that compromise position, but

5    it is unduly burdensome and it is not calculated I think ---

6    refined -- the potential evidence is actually relevant to the

7    claims in the case.  The allegations.

8          But 2015 material might.

9          THE COURT:  Well said and I still have my leanings

10   but I can certainly be moved further but chances are you will

11   need some either different arguments or find another way to

12   get my up on a different side of the bed in the morning then I

13   have to rule upon any of this.

14         But I do want to also express my -- some clarity and

15   I guess that we will have to bounce back to Ms. Lockner, is

16   there an agreement that the Florida court was really speaking

17   about in October 2014 period?

18         MS. LOCKNER:  It wasn't according to an agreement.

19   He settled I think on I think splitting the babies(sic) if I

20   recall correctly and I just want to refer to the transcript.

21   But if I can speak a little bit to the 2015 2016 issue.

22         THE COURT:  Before you take me there, let me

23   interrupt, before you take me there, I wasn't sure what was

24   meant by the timeline.  Are we really talking about January 1,

25   2014 or are we talking about October 1, 2014?

1           MS. LOCKNER:  Oh I am sorry, Your Honor.  No we

2    didn't specify to have a subpoena October 1, 2014 to the

3    present.

4           THE COURT:  Okay, thank you.  So take me where else

5    you want to.

6           MS. LOCKNER:  Okay.  So I just wanted to point out

7    that AKF spends a lot of time focusing on the allegations in

8    our complaint, understandably but the first line of our

9    complaint in paragraph one says "Since at least the beginning

10   of 2016 and likely years earlier" and goes on.  Our attachment

11   A or Exhibit A to our complaint did have specific claims

12   relating to 2016 -- this was really our obligation under Rule

13   9(b) to seek --- with specificity.  We did that but the Rule

14   90 threshold is to not constitute the whole scope of a

15   complaint.

16          And in fact, the discovery since the time from ARA

17   has made clear that this scene did in fact go beyond just the

18   30 people that we have been able to identify.  Again this is a

19   fraud case and we don't have all of the information and it did

20   in fact go back to the 2015 plan year.  So for that reason, I

21   tend to agree with Your Honor that I do think there is the

22   need to go back to the October 1, 2014 open enrollment because

23   we know that the dispute was going on both in 2015 and in

24   2016.

25          THE COURT:  Okay well hopefully that will shape

 1   maybe future discussions that you all may have on the subject

 2   and you can find a way to compromise as opposed to ramping up

 3   the litigation engines. But be that as it may, let me swing

 4   over to the Fund and give your knowledge to pick one of these

 5   issues and we can talk about it.

 6           MR. BUSHOFSKY:  Sure.  Before I give up on the date

 7   issue and what period is at issue, I mean, I think

 8   Ms. Lockner's statemetn you know, I don't think she is making

 9   misrepresentations obviously but the things that she was

10   talking about sort of vague references to evidence that she

11   got from someone else that shows that this report scheme or

12   conspiracy extended into the 2015 plan year.  As I understand

13   it, that is not actually in the complaint.  And the complaint

14   as it stands has not even left passed muster under either Rule

15   9(b) or 12(b)(6).

16           And so the idea that what other courts have called a

17   fishing expedition should apply to my charity clients so that

18   they can go back three years or four years instead of one year

19   or two years which will increase the the burden on them by 100

20   percent or 200 percent.  Because they will simply be looking

21   at more documents, four more years.  There is not something

22   that I can agree with.  And it doesn't make any sense to me.

23           I understand Your Honor's inclination and I am sure

24   that the Judge in Florida was --- in ordering what the

25   discovery should be.  But I don't think that that necessarily

1   should apply to a stranger to the litigation who is a third

2   party with limited resources.  And so if there is a particular

3   other issue that  Your Honor would like for me to address

4   next, I am happy to do that.

5           THE COURT:  Well, I didn't have an order.  I

6   reviewed your submission.  But I felt like you would be

7   probably be inclined to talk about those things that are most

8   dear to your side of the equation. I mean, I can cherry pick

9   and find something but --

10          MR. BUSHOFSKY:  No, Your Honor.  I didn't mean to

11  put the burden on the Court, I am sorry about that.  I am

12  happy to address what is near and dear to our heart next. I

13  think that a 30,000 --- level, one of the things that is most

14  concerning to me  and it covers a variety of the demand, both

15  in the formal -- in the follow up letters is the concept that

16  my client should be providing to this giant health care

17  company that is one of the 5 or 6 biggest profit making

18  companies in the  United States and easily the largest private

19  health care insurer, information about patients who are both

20  by definition because they are being helped by the American

21  Kidney Fund and or disabled who apparently according to

22  United, they want the information regardless of whether these

23  particular patients are insured by United or are patients of

24  United's adversary in the litigation, ARA.

25          THE COURT:  Let me interrupt you.  Let me swing over

1   to Ms. Lockner because I do have some concerns there.  As I

2   understand it, again the Court in Florida has spoken to this

3   issue.  It seems as though you are not getting one, anything

4   beyond the core Affordable Care Act kind of policies that

5   United says is in play.  And I get the impression that that

6   core is basically saying you are not going beyond the universe

7   set forth in the claims in the second amended complaint and

8   therefore this case seems somewhat limited.  I will give you

9   the floor.

10          MS. LOCKNER:  Thank you, Your Honor.  So --- the --

11  I want to first address the order that the --- is relying upon

12  a lot for that argument.  That order dealt with a very  narrow

13  set of requests that we had sent to ARA.  Let me back up we

14  have been getting all kinds of information about ACA plans or

15  cases on ACA plans but beyond that we also got another sort of

16  specific case information.

17          We knew of 30 patients when we plead the complaint.

18  We learned of 24 more ACA patients after -- through discovery

19  from ARA.  And but in addition to that, we have had a much

20  broader scope of things that has not been limited to just the

21  insurance plans in play or are named.  And in general

22  discussions about --- practices, the AKF, that kind of thing

23  has been generally allowed.  It is when we get into specific

24  questions of names of specific individuals and that is what

25  was at issue in the order that the Court was addressing.

1          We had gone back and said we would like to see --

2    because it looks like from documents that we had, that the

3    seam(sic) did extend beyond the ACA plan.  We went back to the

4    Court and said can we get -- can we have them identify who

5    those people are who are getting a --- funding beyond ACA

6    plans?  And on that point he said no.

7          So we -- I want to be clear, I am not speaking

8    identities or names or micro level information about non-ARA

9    non-United case.  That did then however -- the theme that we

10   have plead generally deals with this fair play -- this honor

11   system which means that in the aggregate what is happening is

12   from what we can tell is that ARA makes monthly sometimes more

13   than once a month payments to the AKF and it is our belief and

14   there is a lot that we have that suggests that then means that

15   the AKF is funding a comparable amount back to ARA's cases.

16          And even Mr. Bushofsky in our last meet and confer,

17   we talked about this that the AKF does not slice and dice this

18   based on what kind of plan the members are on.  They just see

19   the number that goes out, there is a number that comes in.  So

20   when we are talking about some of the financial measures

21   perhaps or just the theme in general, when it is like a higher

22   level more generic discussion, not necessarily by individual

23   patients, in that aspect, Your Honor, there is -- because we

24   are not going to be able to show that the amount AKF pays to

25   the AKF was essentially quid pro quo in the amount in the

1  aggregate that was paid back because it wasn't done on an

2  individual basis.  So the payments by the ARA was done in

3  aggregate basis.

4         THE COURT:  I get your point and I interject only in

5  the sense that I want you to understand the canvas that you

6  are trying to write on in terms of my impressions and how to

7  move me around.  And quite frankly, after reading your

8  submission, I understood how it could be difficult for United

9  to pursue its action if there is this is kind of a -- in your

10 words, a kind of a global check going from the fund for all

11 contributions that may relate to ARA and back and forth in

12 that regard without articulating or specifying which patients,

13 which people may be involved for what amount of  much smaller

14 contributions or ---.

15        But when I look at the Court's response to that

16 interrogatory number 17, I don't see any ambiguity there in

17 terms of the Court's ruling.  I understand from what you are

18 telling me that you were trying to pursue more particularized

19 information which you are now seeking at this time but I --

20 maybe you need to guide me through this a little bit better in

21 terms of the reading that I did.

22        MS. LOCKNER:  Yes and I understand that, Your Honor,

23 that order, I can order for somebody who hasn't been living

24 and breathing this case.  So it would certainly give us I

25 think a different impression than perhaps what it does to

1   those ---.  I want to back up because when we move -- we  move

2   to compel against ARA back in January.  And we got really

3   everything we wanted with respect to the AKF.  It was not

4   limited to just AKF -- from ARA.  It was not limited to just

5   AKF related materials having to do with the ACA.

6          So we had a broader deal that we were working on and

7   that we had gotten -- we were told that we got stuff from ARA

8   that was certainly far broader than just like I said, AKF

9   related to the ACA.  We were interested in going back and that

10  order that you are referring to was precisely about two

11  requests that we were dealing with very specific -- and that

12  was dealing with individually made people.

13         We wanted to know how many people were receiving AKF

14  funding at ARA that were United members.  And that is where

15  the Judge said no I am going to cut you off,  you are going to

16  be limited to the ACA when it comes to the individual names of

17  people.  And that is -- we can provide you with the briefing

18  that would show that that was about and I can provide you with

19  the transcripts of the ruling from back in the

20  January/February time period where it is clear that we had

21  broader -- we were granted broader discovery.

22         More generally it really when we just -- when we had

23  gotten to the point where we were asking for individual names

24  and identity of patients that the Court said no.  And that is

25  when I am more than willing to abide by that.  And in fact my

1   very first letter to Mr. Bushofsky, that motion had been

2   pending and I said we would live by the parameters of what was

3   decided there.  And I will when it comes to individual names

4   and people and individual payments.

5              But we need to understand in the aggregate how that

6   process works, how the expectations were ARA by the AKF.

7   Those more general higher level kinds of documents and

8   information.  That we think is what clearly allowed by the

9   Florida court with respect to ARA and is necessary for us to

10  get what we need.  And like I said, ARA in many ways did

11  distinguish between and they tracked things different based on

12  whether someone was on an ACA plan or whether it was on a ---

13  plan, whether it was on COBRA, they did track it differently.

14             My understanding is from Mr. Bushofsky is that the

15  AKF has not -- they don't particularly -- they are not ---

16  really what the plan is so I don't think it would even be

17  really possible for them to delineate and price this the way

18  that they suggests that they can.  But to be clear, I am not

19  asking for individually named people who are not ARA members,

20  United members for ACA ---.

21             THE COURT:  Well, I certainly can't resolve the

22  issue today.  I do still enjoy some confusion about what in

23  space may seem to be a reasonable request to try to understand

24  how the monies may flow back and forth by getting the

25  information from the AKF and then ARA if possible, but this

1  limitation that seems like the limitation that is set forth

2  there in the Court's order of July 10, 2017, stands true then

3  I don't see how you can get from the backdoor what you

4  couldn't get through the front door.

5         And as I understand it, this paid for play concept

6  would basically be more of a --- discovery production and

7  response more so than those limitations might allow.  So I

8  can't resolve it but I hope that both sides understand my

9  confusion and dilemma in the event that this thing will move

10  forward with any kind of briefing.

11         So I guess I will go back to the United with another

12  topic that you can pick.

13         MR. BUSHOFSKY:  Your Honor, may I address Ms.

14  Lockner's comments about what the court in Florida supposedly

15  meant in contrast in which is written down on His Honor's

16  order?

17         THE COURT:  Go right ahead.

18         MR. BUSHOFSKY:  All right, so first of all, Your

19  Honor wasn't there and I wasn't there.  Ms. Lockner was and

20  then ARA was as was the judge.  So I understand her perception

21  of what was  happening but all we have to look at is a

22  transcript and the order.  The order is very clear as Your

23  Honor has said.  Just a second -- and Your Honor, Mr. Farrell

24  was just directing  my attention to a January transcript which

25  we can provide to Your Honor or you might already have where

1   the Court addressed the overbreath issue and I think that the

2   comments from the judge are very  much in line with the words

3   on the paper in his later order.

4           It says that his concern, "The concern I have is

5   that I think this case because it is so large, the discovery

6   sought is so large, if you go beyond the allegations of the

7   actual complaint, because I do believe that a complaint is

8   more specific, I think the complaint refers to these

9   plaintiffs, two defendants and it really does seem to involve

10  a scheme to kick people off or induce people to stay off

11  Medicare and Medicaid and get them to a ACA plan.  That seems

12  to be the way I read the complaint.  For example" and then the

13  Court goes on to read from the complaint.

14          And then finally I guess the punch line is, the

15  judge says, "So certainly the plaintiffs are entitled to

16  discovery dealing with whether ARA personnel at ARA's

17  direction worked to convince dozens of patients in Florida and

18  Ohio to abandon or forego Medicaid coverage and enroll in

19  commercial plans offered by United through the ACA."

20          And so now today Ms. Lockner as she did in this

21  motion, was addressed by the Court's order, more recently is

22  seeking information regarding all sorts of different things

23  and different people that don't have anything to do with ARA,

24  Obamacare plans in Florida and I am sorry, United Obamacare

25  plans in Florida and Ohio, but also all sorts of other plans

 1    including COBRA, Medigap and employer plans.

 2              And just for some contacts, Your Honor, because

 3    there has been a lot of narrative about this reported scheme

 4    and how my client which is a 50 year old charity and has the

 5    highest charity ratings available by the neutral sites and

 6    organizations that rate charities, that it is really just a

 7    tool of some big core profit dialysis providers.  And the

 8    allegations in the complaint are just the tool for the

 9    providers to help make money off of Obamacare.

10              And the allegation now is that no it is actually

11    much bigger than that.  It involves COBRA and things like

12    that.  Well, Your Honor, the context is this.  Upon passage of

13    the ATA(sic), insurance companies can't discriminate based on

14    prior existing conditions.  Inside the plan or outside the

15    plan, in my view of the world and I litigate it that forced

16    insurance companies to take the Ryan White funds for people

17    living with HIV and Aids when the insurance companies were

18    rejecting those payments, even though it is a Government

19    charity on precisely the exactly same allegation as we are

20    here today levied at my client, AKF.

21              So they don't want sick, poor people on their

22    private plan because they are expensive to take care of.  And

23    they have to take the same premiums as someone who is healthy.

24    And so our big concerns and one of the concerns that we kept

25    trying to bring to Your Honor's attention in our papers is

1   there is a real danger of a fishing expedition here that is

2   inconsistent with what the Florida court ruled and certainly

3   what the Denver court in the other subpoenaed case ruled.

4          Our big concern is that this little old case

5   involving somewhere between a couple of dozen which is in the

6   complaint and maybe a couple of dozen 24 more than Ms. Lockner

7   said she has discovered through the discovery that she got

8   from ARA is really just like a DOHA investigation that a bunch

9   of private lawyers at Robins Kaplan are conducting and they

10  are going to look for the next case on behalf of their

11  insurance clients and that is not appropriate use of

12  discovery.

13         And I guess more as a point for my client, it gets

14  real expensive real fast for a charity in AKF's position.  The

15  case is about particular United Healthcare plans in Florida

16  and Ohio for a very limited period of time under an allegation

17  that people were being moved to Obamacare policies because

18  they get a lot  more reimbursement -- the providers get more

19  reimbursement under that type of policy than under a

20  Government program.

21         So we agree with what the Court says in Florida on

22  this issue. I think it is very clear and I can't see anything

23  in the transcript that suggests otherwise.  I am happy to

24  address the next issue, Your Honor.

25         THE COURT:  Well, before you go there, let me add a

 1   little two cents here and that is as I read this order from

 2   July 10, 2017, I would agree with you that Medigap and COBRA

 3   and employer sponsored group plans are not in play. I think

 4   the numbers --- about whether it is the 30 or the 54 and since

 5   we are talking to some degree about who is in and who is out,

 6   it seems like this thing is more from what was set forth in

 7   the second amended complaint and the attachments thereto, so I

 8   guess I should give Ms. Lockner the last opportunity to speak

 9   to the numbers that are in play to the extent that there is

10   some dispute there.

11          MS. LOCKNER:  The number that we know of Your Honor

12   is 54 at this point.  Like I said 30 of them were the ones

13   that we knew of when we filed the complaint that we had been

14   able to discovery on our own.  And then there were 24 more

15   that ARA had identified during the course of discovery --

16          THE COURT:  You are telling me that ARA disclosed

17   these additional people to you?

18          MS. LOCKNER:  Exactly.

19          THE COURT:  Okay let me ask the Fund about that.

20   Why shouldn't it be up to 54 now?

21          MR. BUSHOFSKY:  Your Honor, we don't know anything

22   about this.  This is just based on Ms. Lockner's kind of

23   anecdote about what she and her colleagues apparently have

24   found in their review of documents that ARA produced.  And by

25   the way, I think that Ms. Lockner and I don't think that she

1   misspoke said that they got all the documents related to AKF

2   that they asked for and that they wanted.  I think the purpose

3   of her comment was to suggest that what is good for the goose

4   is good for the gander and what my client's AKF's problem was

5   also producing whatever documents she wants.

6          First of all, ARA produced whatever they produced.

7   There was some  level of document that they had to produce

8   under the Court's order but of course, no one has ever gotten

9   in trouble for producing too many documents to the other side

10  and sometimes they do that.  And Your Honor knows that and

11  lots of times, rather than look through a bunch of documents

12  to figure out what is truly tailored and specifically

13  responsive to requests, you just give the other side all of

14  the guys' e-mails.  Because you don't want to look through

15  them and you are not that concerned about what is in them.

16  That doesn't have any bearing on the burden on my client.

17          THE COURT:  Well, let me suggest this.  I want to

18  get us through this because we have a bunch of other issues.

19  To the extent that United contends that there are additional

20  patients of ARA that in some way are linked with the Fund in

21  this umbrella of the complaint, I want the particular

22  discovery or whatever it is that is the basis for United's

23  belief just provide that to AKF and hopefully you are on the

24  same play -- on the same page because it may be that there is

25  no real dispute there.

1          But right now as I understand it, AKF is sitting in

2     the dark wondering who these particulars are and what is the

3     basis for believing that they are part of it.  It may be an

4     issue of no dispute.

5          MS. LOCKNER:  And Your Honor, this is something that

6     we factored into the subpoena.  We again we couldn't identify

7     the patients because of the protective order but we had said

8     that once they signed the Exhibit A to the protective order,

9     we would provide those identities.  We have asked several

10    times for them and to go to a different point now that the

11    protective order, we did get leave from the Florida court to

12    share things and to modify that order subject to the AKF

13    signing Exhibit A and as well as  having Your Honor enter a

14    order that was as -- that has the same strength against it as

15    the one in Florida.

16         We have exchanged versions of that and I think we

17    will be ready to get that to Your Honor on file later today

18    hopefully.  So if Your Honor -- once Your Honor signs that and

19    then once the AKF signs the Exhibit A, we are good to go.  So

20    that won't be a problem.

21         Your Honor, if I could turn to a couple somewhat

22    related issues I think that maybe we will drive home the --

23    the challenges that we are dealing with and maybe get your

24    guidance on.

25              THE COURT:  Okay.

1          MR. BUSHOFSKY:  Ms. Lockner before you move on, can

2   I address one issue that I think might -- it goes to a comment

3   that the Court made that might resolve something here.  I just

4   wanted to make it clear that we have already offered you

5   information about the specific patients at issue, once the

6   information about those patients is revealed.  And I wanted

7   to -- that might sound like it is inconsistent with your

8   recitation of my statement that ARA doesn't really care or

9   keep track of what kind of policies people have.

10          Let me be a little bit more clear for you and for

11   the Court so that  Your Honor understands exactly what I did

12   mean and did say.  This charity doesn't discriminate based on

13   what kind of insurance people have.  They also don't care

14   about who their provider is.  And so when a person who

15   qualifies because they have a disability which is defined as

16   End Stage Renal Disease, meaning that you have to have

17   dialysis to live because of kidney failure and you meet

18   certain financial eligibility requirements, meaning that you

19   can't afford lots of things in your life including potentially

20   insurance --- exchanging.

21          Once those criteria are met and you have gone

22   through the process of applying for a grant, you get a grant.

23   Or whatever healthcare coverage you might need and I am just

24   being specific to healthcare coverage now, the American Kidney

25   Fund does lots and lots of other things for people who are

1    living with End Stage Renal Disease.

2             But focusing on the insurance issues, the truth is

3    and I don't think Ms. Lockner contends otherwise, the American

4    Kidney Fund mostly helps people that are on Government plans.

5    And one of the things that United Healthcare appears to be

6    teaching now is information about how we help people even on

7    Government plans.  Because as it turns out, United has

8    contracted the Government to provide services even related to

9    Government plans.  I won't get into the incredibly complicated

10   details of those types of things but that is the case.

11            And so the fact that -- the fact that we don't --

12   that we don't discriminate doesn't mean that we are unable to

13   tell someone in United's position who receives a grant that

14   has an Obamacare plan versus some other kind of plan.  So we

15   actually can provide that information and we have offered to

16   do that.  I think that they want a lot more than that, which

17   is the real problem.

18            MS. LOCKNER:  Your Honor, if I can --- I think I

19   would like to --- to actually what my point was here, which is

20   the grant --- two unrelated issues.  One thing I did like from

21   AKF is to know okay, each month how much money did you get

22   from ARA?  And how much money did in the aggregate and how

23   much money did you get in aggregate to all --- because that is

24   the only way that we can show that this is really a quid pro

25   quo and using a path for the kick back team(sic).

1           And from my understanding, I do not believe it is a

2    situation where ARA says oh here is our payment for ACA plans,

3    here is our payment for employer group health care plan and

4    here is our payment for this.  It is a lump sum amount that

5    cannot be parsed down and nor can -- and that way the

6    aggregate number back also needs to be the aggregate number.

7    That I don't think we can prove our case without having that

8    higher level visibility.  And again I think it is a simply

9    request it is just the number each month going in and out from

10   and to ARA.

11          So that is quite simple.  So I would be interested

12   in your take on that Your Honor because I don't see how we

13   prove out -- you know from a damages stand point, yes we are

14   easily -- we are right now limited to the ACA plans.  I don't

15   dispute that and that is why we are not going to get into the

16   we's(sic) on the individual cases.  But from a standpoint of

17   showing how this team operated, they can't do it -- we can't

18   prove it by just getting individual information on a --- plan

19   because that higher level showing how the team itself worked

20   is not broken down that way.

21          THE COURT:  I will tell you that I am undecided on

22   the approach there for the same thing that we talked about a

23   little bit earlier.  That is it makes sense to me what you are

24   suggesting, however, in light of the limitations imposed by

25   the Florida court, I don't know that the request isn't

1   pregnant with information regarding other monies that may flow

2   between the two, whether it is Medigap or COBRA or something

3   else.  I don't understand how you can get into the particulars

4   of those patients and their interactions or how their files

5   are being handled without having that  kind of particular

6   information but I am not inclined to get in front of the

7   Florida court in any way, shape or form.

8            So if that is an issue of discovery, whether it is

9   applying only to ARA or to other aspects of the case, you may

10  end up having to get some guidance from them or you may have

11  to just wait for me to struggle with whatever written

12  submission may be necessary on either a motion to compel or

13  the motion to quash.

14           MS. LOCKNER:  And Your Honor, if I could speak to

15  that, we do have a document from ARA -- I guess we have

16  received documents and discovery --- when it comes to amongst

17  paying(sic) and other aspects of the case.  So we do have a

18  document at least going back I think to November 2015 that

19  shows the aggregate amount of these payments that ARA made to

20  the ---.  We would like to confirm that ARA has the same --

21  the AKF has the same calculation, simple enough I would hope

22  and then to see what the aggregate amount that was paid to ARA

23  plans because it doesn't seem to be something that the ARA has

24  in its -- at least in the documents that we have received.

25           So I wouldn't say that you are getting out ahead of

1  the Florida courts, Your Honor, because to some degree we

2  already have parts of that information from the ARA.  We would

3  just like to confirm that the AKF's numbers match and see what

4  the return amount going to the ARA's patients again in the

5  aggregate --

6           MR. BUSHOFSKY:  Your Honor, may I?

7           THE COURT:  Sure.

8           MR. BUSHOFSKY:  Okay so this comes up a lot and I

9  have been on both sides of this, I understand Ms. Lockner's

10 position and she has a client, but what I have just heard is

11 we have got the information that we want which is perhaps

12 broader than what was required under the Florida judge's order

13 and now we want confirmation from a third party.  I mean, that

14 is not an appropriate use of third parties discovery.  It

15 doesn't sound like it is controversial.  It doesn't sound like

16 Ms. Lockner thinks that the documents that she received was

17 tampered with.  Or that it was falsified.

18           And that they need a third party to look for the

19 same document or the other side of the same communication.

20 That is one point.  I think it is -- I think it is emblematic

21 of the problem of a bigger problem with the request.  The

22 suggestion that we are not telling you, Your Honor that ARA

23 isn't complying with the discovery orders or holding anything

24 back.  There is no spoilation alleged but we need all of the

25 same stuff from this third party just to be sure.

 1              That is one point -- please, the other point that I

 2    wanted to address quickly was the suggestion that we need to

 3    give Ms. Lockner's client, a big insurance company that has

 4    lots and lots of metrics that follow people around for the

 5    rest of their life and we represent sick poor people.  So it

 6    is a big concern of mine.  But the idea that they need all of

 7    the numbers and all of the information because AKF doesn't

 8    discriminate based on what type of insurance people want.

 9    That is not AKF's problem and it is probably not ARA's

10    problem.  Just a problem with the Fraud Theory.

11              The Fraud Theory is that Obamacare opened up this

12    loophole that allowed providers whether they are doctors or

13    dialysis providers or doctors who take care of people with HIV

14    and Aids, there was an opportunity for people who are really

15    sick and poor, for some third party to come in whether they

16    are completely charitable and on the up and up or they are a

17    greedy doctor who wants people to have unnecessary surgeries.

18              To have some third party come in and say hey I will

19    pay for your premiums, you come over and get surgery and

20    dialysis and then I will submit it to United instead of

21    Medicare or Medicaid or something else because they make more

22    money off of the contract that I negotiated with United versus

23    the contract that the Government was able to impose on and

24    negotiate with the healthcare provider.

25              The fact that Ms. Lockner is not able to look at the

1   donations, not the payments but the donations until someone

2   discovers otherwise or finds otherwise and IRS surely hasn't,

3   or we would know about it and hear about it.  The donations

4   made by the healthcare providers pursuant to the OIG 1997

5   guidance which said dialysis providers go on ahead, this is

6   good for society, good for people dying of kidney disease,

7   make whatever big donations you want to the American Kidney

8   Fund and charities like it.

9        The American Kidney Fund can't discriminate in your

10  favor.  They can't treat their people better than they treat

11  other people who are dying of this disease.  And there can't

12  be any kind of obvious explicit quid pro quo because all of

13  that is a kick back.  So the 97 guidance is a safe harbor

14  against anti-kick backs laws.  And so what she is saying is,

15  well gosh they don't discriminate and they don't keep track in

16  complete compliance with the government guidance that provided

17  a safe harbor so we need all of the information and we are

18  going to dig into it and figure out where the quid pro quo

19  actually is.

20       MS. LOCKNER:  Your Honor, this is exactly why I have

21  a second point --

22       THE COURT:  Let me jump in --

23       MS. LOCKNER:  -- that I was wanting --

24       THE COURT:  -- let me jump in momentarily before we

25  start.  And I appreciate the continuing education here and I

1    am going to try to learn the language and get nomenclature

2    better.  I like the  use of the words donation from ARA to the

3    Fund.  And throughout all of this, I will be continuing to

4    struggle with how much information should united be entitled

5    to pursue from the Fund in light of information that it

6    already has obtained from ARA.  And initially the first

7    reaction would be that if you got it from one place, what

8    gives you the right to go pursue it someplace else?

9            The difference here as compared to many other

10   instances in which we have Rule 45 in play, is that there is

11   no -- the Fund is not being couched as just an innocent

12   bystander who happens to have records.  The Fund is being

13   couched as a one that is complicit and part of this

14   conspiracy.  And so it is not quite the same as I may

15   entertain in other cases in terms of trying to balance the

16   burdens and the unreasonableness of any request.

17           But in this instance, it sounds as though what

18   United is seeking is really a monthly representation of

19   donations coming in and monies going out through the ARA.

20   That does not sound to me like it should be burdensome.  It

21   does not sound to me like it is something that is going to

22   take real computer expertise to punch out numbers which really

23   probably are going back a year or 18 months at best.  So I am

24   pretty much leaning towards United in this respect only in the

25   sense that to the extent that the ARA has provided this

1   information -- they have a bench mark, it is not a fishing

2   expedition and they are dealing with an opponent who they

3   believe is evil incarnate.  And they should in this instance

4   be very cautious about accepting every representation that may

5   flow from their adversary.

6           And to the extent that they pass muster, if they get

7   passed the motion to dismiss, yes they got a real green light.

8   But even here as I am sitting here for the Florida court to

9   make that ruling, I am inclined to give them leeway to get

10  that that kind of information as long as it is not

11  particularized in ways that I haven't heard.

12          MS. LOCKNER:  And Your Honor, if I could add to

13  that.  One of the other pieces that we need and this is where

14  we have not gotten any real visibility from ARA is not only to

15  see an amount that ARA has been paid --- but we understand

16  that the AKF made requests of ARA as well.  And what we would

17  like to know is did those requests match what ARA ended up

18  paying.  And part -- we would like to understand how is it

19  that ARA or AKF came up with these amounts that are requested

20  from ARA.

21          And again part of this I will be able to explain

22  much more freely once we have a protective order in place and

23  Mr. Bushofsky and his colleague have signed Exhibit A, but to

24  suffice to say there is -- there are things that I will be

25  able to show would suggest that AKF had unique information

1    about aggregate amounts that were requested and discussions

2    that were had with ARA that we need visibility into.  And

3    again, aggregate levels -- not talking about individual and

4    not talking about metrics on a individual case basis but how

5    is it that they calculated and decided what they were going to

6    request of ARA each month.  Those are important  things that

7    we have been ---.

8                 THE COURT:  Okay --

9                 MR. BUSHOFSKY:  Your Honor --

10                THE COURT:  -- let me just say that we are starting

11   to get into some of the bewitching hour because we have been

12   at this for an hour and I am making it another half an hour

13   but I want to make sure that I can reach everything that I

14   can.  Let me go back to Mr. Bushofsky, you had something to

15   say?

16                MR. BUSHOFSKY:  Yes, thank you.  So one of the great

17   limiting factors in litigation of discovery is reciprocity,

18   Your Honor.  And you know, sometimes that gets out of whack

19   when some individual named plaintiff in the class action

20   brings a case against a big company -- the individual has no

21   documents and the company has a lot of documents.

22                But in general, and I think it is the case in

23   Florida where ARA has motion practice against United to compel

24   them to produce documents and United has the motion practice

25   against ARA, you know they are hashing them up themselves and

1   they are parties to a lawsuit.

2           AKF isn't.  And AKF doesn't have that reciprocity.

3   The way to give AKF that limiting power would be if this

4   company, United Healthcare which continues in every

5   opportunity to describe the donations that were permitted in

6   the Federal Government in 1997 to describe them as payments

7   and bribes and kick backs and things like that, with the

8   charity as the hub of the conspiracy is to name AKF as a

9   defendant.

10          Of course, when they name AKF as a defendant, then

11  AKF gets discovery against United Healthcare and indeed AKF

12  might have to bring its counter claims on behalf of its

13  beneficiaries under the Federal Rules against United

14  Healthcare.  Which I would do frankly, and I might relish it.

15  But that is not happening right now and we are not a plaintiff

16  or a defendant or a counter plaintiff in the case.

17          And so if this is a one way street.  The idea that

18  we could provide just numbers on a monthly basis, here is how

19  much we got from ARA donations, here is how much we have paid

20  in charitable assistance to ARA's patients -- I am sorry, yes

21  to ARA's patients over the course of a relative connected time

22  period.  It is probably information that we can get, it is

23  probably information as Your Honor said that wouldn't be that

24  burdensome to provide.

25          Particularly if it is not broken down by policy type

1    or things like that.  The problem with that is, and maybe we

2    can get passed it, is that by definition we are going to be

3    providing them all sorts of financial information, just

4    numbers I understand but financial information that has

5    nothing to do with the scheme alleged.

6            Because the great vast majority of money that my

7    client -- a charity provides to sick poor people goes towards

8    things that are not premium payments for United Healthcare

9    plans on the Obamacare exchanges.  And so it is not relevant

10   to the claim.  United is now going to have all of this

11   information about relationships between charitable donors and

12   charity.  And money that ends up going to ARA's patients.

13   That doesn't have anything to do either with United because I

14   guarantee that most of the patients of ARA are not United

15   policy holders because the vast majority of them actually have

16   Medicare.

17           And so I am not sure how relevant that information

18   could actually be and I think that is relevant to -- leading

19   to a relevant is still the kind of low water mark to whether

20   you can get to discovery.  But it is easy enough relevance --

21   you know maybe that is not an --- here, Your Honor.  But the

22   other stuff about what the charity was requesting -- first of

23   all there is nothing wrong with charities reaching out and

24   asking people for money to help.

25           But the suggestion is that we were calculating a

lnc                                                                    36

1   particular number, we held them up for it and they gave us

2   exactly that number.  We could look into that but I haven't

3   heard anything specific about ATA(sic)plans, United plans --

4   the people in Florida, the Florida Ohio plans -- the

5   suggestion is that the charity asks big providers for money

6   that are not specific to anything about United or even

7   Obamacare but we are supposed to give all of our

8   communications and information about our charitable requests

9   of our donors to this giant healthcare company that keeps

10  metrics on patients around the United States, it doesn't seem

11  appropriate to me.

12          THE COURT:  Well, it sounds like that is a policing

13  issue and it is also a discovery problem that the two of you

14  will gnaw at for some time.  From the policing side of it, I

15  guess some of that is going to be have to be dealt with in

16  whatever protective order or confidentiality agreement that

17  eventually is laid down.

18          But in terms of your production, we are caught

19  between a rock and a hard place where on the one hand, I agree

20  with you that they are not entitled to all of this information

21  with respect to monies going in either direction for non-ACA

22  folks.  But on the other hand, you are telling me that you

23  don't have the means to whittle it down to identify those that

24  really would be relevant or really more helpful in this

25  discussion.

1           On a side note, with respect to -- a request for any

2    communications for any contributions, whatever, I don't find

3    that to be problematic and I do find it to be something to be

4    protected on the back side, hopefully in a way that is more

5    ironclad than not.  But for now, I think I have spoken to

6    those leanings.

7           So I do think the ball is back in AKF's court in

8    terms of something that you would like to talk about.

9           MR. BUSHOFSKY:  Your Honor, one thing that I think

10   is a real fishing expedition, Ms. Lockner and her colleagues

11   say that they don't know anything about the DOJ subpoena that

12   my client received --

13          THE COURT:  Let me interrupt you.  Let me interrupt

14   you and let me go to Ms. Lockner -- I am trying to think -- I

15   understand at some point you were asking for all

16   communications with the DOJ and the AKF and if the AKF is

17   correct in saying that you don't know even know specifically

18   what was requested, why should they just hand over everything

19   that was involved in what could be a very expensive event?

20          MS. LOCKNER:  Well, Your Honor there are actually a

21   couple of -- all I can go off of is  news article.  And so

22   there are articles that talk about DaVita, Fresenius and

23   American Kidney Fund being subpoenaed relating to the HIPP

24   program which is exactly at issue and AKF confirmed that they

25   did receive a subpoena.  DaVita stated that its subpoena

1   sought, "The production of information related to charitable

2   premium assistance" so I can only assume that it is similar

3   information.  It just all seemed to come up out after the *New*

4   *York Times* article -- Christmas article that really dealt

5   exactly with the allegations that we have made in our

6   complaint.

7          So in the situation where we ask the -- we requested

8   the similar information from ARA, and what the Court did there

9   was to the extent that there were -- and this is the best of

10  my recollection, the extent that there were documents that

11  were solely about other insurance companies or non-United

12  related, those were excluded.  But otherwise, the -- we got

13  information about what they produced to the FCC -- I am sorry

14  not the -- in that situation it was that FCC.

15         Similarly here we think it makes sense, I mean this

16  is exactly the kind of scheme that we are talking about.  It

17  is relevant, it is not privileged.  Because these are all

18  things that they already decided.  And if there is information

19  that they think is solely related to non-United parties, then

20  those can be excluded.

21         I think that the challenge that Mr. Bushofsky keeps

22  talking about, to the extent that our complaint is related to

23  ARA -- I am sorry, HDA(sic) -- that is -- that is going to be

24  a damages issue.  You know but we have to have a broader

25  ability and we have had that ability with respect to ARA to

1  see  how this scheme works in the aggregate and that is what

2  we are asking for.  So with respect to the scheme, it seems

3  like they have already reviewed this information and it

4  shouldn't be burdensome because they have already done it,

5  they have already decided what is not privileged and

6  privileged and if there is some finer nuances they want to

7  explain to me, I am certainly willing to hear it but all I can

8  go off is what I have read in the paper.

9          THE COURT:  Well, and I tell you that my leanings

10  are not to go with you on this one.  Paper could be good,

11  paper could be bad but here the while it is a similar

12  investigation or maybe the identical investigation to

13  basically tell them to pack up and ship over to you everything

14  that they have had to respond by the DOJ being investigatory

15  or regulatory efforts there, without your knowing specifically

16  what is going on in terms of what is the request, seems to be

17  yes a little overbroad.

18          So I am thinking that if in fact you get your hands

19  on something that tells you particularly what they ask for and

20  you know not to replicate that, that is a different story.

21  But I am dealing here with again, as Mr. Bushofsky has taken

22  pains to tell me, most opportunities is the non-party.  Now I

23  am not going to address the notion of whether you should or

24  will be subpoenaing or serving a complaint upon AKF, either

25  now or in the future or whether AKF even has the ability to

1  intervene to do all of this other counter discovery that it

2  may want to do.

3          But as it leans right now, they are a non-party and

4  you are asking them for that information without knowing the

5  particulars of the Government's request.  So --

6          MS. LOCKNER:  And Your Honor, I certainly appreciate

7  that.  I mean, it is a challenge  --- know most of these

8  subpoenas are considered rather confidential, but if they are

9  at least information relating to United or ARA that was

10 produced in response to those subpoenas, that to me would be

11 something that would be very relevant and should be

12 responsible for our request.

13         THE COURT:  And wouldn't that have been something

14 that you would be requesting anyway?  Basically you are piggy

15 backing on the Government.  And I don't fault you for that,

16 but here it is you are seeking discovery directly from them

17 and basically you are using this to say -- and if I forgot

18 anything or if you produce something somewhere else and it may

19 be helpful to me, give me that too.  And while that may not be

20 as offensive if we had a true battle of two giants here in --

21 in one litigation, this is the  non-party if you will.

22         And I don't necessarily accept the notion that AKF

23 is the little sister of the poor but I also don't know that --

24 I am not of the believe that you should get this kind of blank

25 check for information you are not aware of.  It really -- I

1    need you to be able to tell me with more particulars, look the

2    Government subpoenaed this information in request number 4

3    asked for this and we want that as well.  That kind of thing.

4           But that is --

5           MS. LOCKNER:  --- Your Honor, unless Mr. Bushofsky

6    is going to offer to share the subpoena with me, I don't

7    remember -- I am never going to have that -- I think part of

8    what I was thinking was that this would be a -- you know, you

9    point that I ask for this in other requests is certainly

10   accurate.  The question of whether they are ever going to

11   agree to give us any of that remains to be seen.  To me this

12   seems like a possible way of finding --  you know this is a

13   discrete category of documents that they have already gone

14   through so in some ways it seems like a way to find compromise

15   that of some of the other requests that we have made to

16   minimize any burden on them.  Because it already reviewed a

17   lot of these.

18          So if they could do a search for ARA and United or

19   some other search terms perhaps we could agree on of that

20   category of documents, that might be a way around some other

21   objections to other requests.

22          MR. BUSHOFSKY:  Your Honor, if I may?  I agree with

23   you and I am sorry that I am not going to take yes for an

24   answer from Your Honor, but I just want to address this on the

25   record because we are on the record.  I mean, United

42

1   Healthcare wants AKF to be gone.  There is no question about

2   and that is probably true for a couple of other insurance

3   companies.  I know you were being facetious a little bit Your

4   Honor by saying that they are not the little sisters of the

5   poor but it is a 501(c)(3) charity that has been in existence

6   for 50 years.

7          It is run by terrific people who were public

8   servants for years before they took a pay cut even from the

9   Federal Government to run this charity.  They have never been

10  indicted, they have never been a defendant in a false ---

11  case, not yet.  They haven't -- Ms. Lockner might be chomping

12  at the bit to do that, I guess.  And so I think that you have

13  to take them as you see them at this point and they are if

14  nothing else like you said a third party and I hate to say it

15  again but they are.

16         And so this is a little bit of a cage rattling here.

17  There is no question about it in my mind.  As much as I like

18  Ms. Lockner, her client is pushing a lot of buttons for AKF.

19  I think they would have liked for AKF to be on that side of

20  this dispute and this involves over a short period of time

21  with AKF being the hub of a conspiracy instead of a well

22  meaning duke(sic).  Which is how I think the insurance

23  industries narrative describes AKF at first, before they

24  declined to take a particular side in this little debate.

25         And so that is some context from my point of view.

1   To say that they just need everything that we are talking to

2   the DOJ about is precisely what Your Honor said, I mean, it is

3   belt and suspenders but it is not only that, it is a set up

4   for a gotcha.  So we have got Ms. Lockner saying that we need

5   a double check on what ARA gave us, we got no reason to think

6   that they holding anything back or they -- there is spoilation

7   or a creation of false evidence but we would like the same

8   stuff and we would like a charity -- a third party to go look

9   for this stuff at their great expense just in case.

10          Well then this is another layer of that, give us

11  what we are asking for and give us what you gave the DOJ,

12  let's line those up and see if they pass -- is a ball on

13  somebody somewhere and I don't think that that -- I feel like

14  that is coming.  And I don't think that that is an appropriate

15  use of subpoena power, Your Honor.

16          THE COURT:  Okay well I have thinned down on that

17  one now and United, you get the next one.

18          MS. LOCKNER:  Your Honor, let me see -- I am trying

19  to figure out --

20          THE COURT:  And it is okay for both of you to run

21  out.  That is fine.

22          MS. LOCKNER:  No I am just trying to figure out the

23  best way I know Your Honor doesn't have a lot of time here so

24  I am trying to figure out where to get the most guidance from

25  you and what would be the most useful.  If we could talk a

1   little bit about figuring out perhaps communications with ARA

2   and again I understand that we have tried to figure out a way

3   to excise certain kinds of communications with ARA but then

4   there is a whole having to do that would even be more

5   burdensome.  So I guess I wouldn't mind trying to explore -- I

6   think we are entitled to -- for --- again I have done this

7   before when I have been on the receiving end of a third party

8   subpoena where it could be very easy to do searches for at

9   American Renal dot com, to and from Kidney Fund dot com or dot

10  org or whatever it is and just easily find all documents that

11  were sent back and forth, you know there is no privilege.

12          And you know that is an easy way to do it without

13  having to necessarily do a lot of reviews.  Now they obviously

14  don't want to produce everything and in fact, we wouldn't

15  necessarily want everything but we would be getting more than

16  we probably want because there is a lot of routine back and

17  forth that we said that we wouldn't necessarily need.

18          But I would just be interested in getting

19  Mr. Bushofsky's take and Your Honor's take on how we can glean

20  some information about communications in a way that would be

21  not too burdensome and yet just give United the information

22  that it needs.

23          MR. BUSHOFSKY:  To the extent that you were asking

24  me, I am happy to address it but --

25          THE COURT:  Go right ahead.

```
 1              MR. BUSHOFSKY:  -- so I mean, I think this is a real

 2   fishing expedition request to basically telling everything you

 3   ever communicated to ARA about over the last four years.   I

 4   mean, ARA is not the biggest dialysis provider and they are

 5   not the biggest charitable donor to the charity but I am sure

 6   that there is lots and lots of communication having nothing to

 7   do with what Ms. Lockner is interested in or entitled to.

 8              And Ms. Lockner knows -- but the Court here probably

 9   doesn't know yet, the Government long ago mandated that the

10   dialysis providers actually have social workers on their

11   payroll and installed in every one of these dialysis clinics

12   for people living with End Stage Renal Disease have to attend

13   multiple times a week for several hours a day to help

14   people -- look if you have -- if you discover that you have

15   kidney failure Your Honor, you might not be able to keep your

16   job.  You probably can't keep your job.

17              Which as an aside is one of the most amazing things

18   about the demand for information in these requests.  For COBRA

19   because what we are talking about is someone who had kidney

20   failure, they lose their job, they want COBRA benefits and

21   they can't afford it because they don't have the job and the

22   American Kidney Fund helps them pay their COBRA copays or you

23   know policy premiums and United Healthcare doesn't like it.

24              But at the end of the day, the stuff that

25   Ms. Lockner is asking for should be a very, very, very  narrow
```

1  subset of communications which we both at the American Kidney

2  Fund and both at ARA and to the point about the social work

3  was simply that.  There are social workers who are there

4  because the Government doesn't have to be there who might be

5  communicating on all sorts of different topics with employees

6  and volunteers of the AKF.

7           Having nothing to do with this supposed --- scheme.

8  And so if what Ms. Lockner really wants and thinks she should

9  get are communication about you know, here is how much money

10  we want from you and you know here is how much money we expect

11  and I guess something coming back from the ARA saying okay,

12  here is how much money we are going to donate this month or

13  this year or this quarter whatever it is.  That is a much

14  different thing than tell us everything that you ever talked

15  to ARA about.

16          And so you know, it would be difficult and time

17  consuming and expensive for us to funnel down all of those

18  communications to the ones that are relevant or potentially

19  relevant.  And the punch line -- the kicker is, ask ARA for

20  this stuff.  Why should my third party charity subpoena

21  recipient be looking or anything and everything that has an

22  ARA e-mail address when she has ARA over there as a party in

23  the Florida case and can ask for and I think has asked for and

24  she told the Court earlier that she got everything, that shows

25  the communication.

1          If it is a supposedly conspiracy and a fraud that

2   involves communications and covert acts between the co-

3   conspirators one of which they allege is my client, the

4   unindicted co-conspirators as counsel has described it, then

5   why not just get the information from the counter party that

6   she has namely the defendant and if and when it looks like

7   there is a gap spoilation, someone is lying, then maybe it is

8   appropriate to come back and say, we are seeing a gap in ARA's

9   production for this date, for that date or they didn't give us

10  the stuff from the guy who we think was dealing with ARA, can

11  you find it?

12          That is a whole different scenario than give us

13  everything between you and ARA for the last four years and if

14  you don't want to look for the specific stuff, that is okay,

15  we will dig through it.

16          MS. LOCKNER:  Well, and Your Honor, I think maybe

17  this is where Mr. Bushofsky and I need to talk about whether

18  search terms are -- I certainly don't want every single e-mail

19  and --- some way to do it easily.  Can I just --- a different

20  topic Your Honor that addresses something that Mr. Bushofsky

21  has mentioned several times already and I would like the

22  Court's guidance on it?

23          THE COURT:  Go right ahead.

24          MS. LOCKNER:  That has to do with the Advisory

25  Opinion 971.  And AKF's compliance with it.  Or you know

1  Mr. Bushofsky has mentioned that several times on this call.

2  That advisory opinion was very much focused on -- first of all

3  it didn't even apply to ARA, ARA wasn't a party to that

4  advisory opinion.  But it also focused on providing premium

5  assistance for Medicare premiums.  It had nothing to do and

6  did not at all contemplate the idea of using these premium

7  payments for commercial plans.

8        It was focused solely on Medicare.  And I think

9  maybe Medigap.  But they have --- up publically many times on

10  their website.  Obviously on these calls.  And so we would

11  like to have information that documents relating to their

12  compliance or non-compliance with that advisory opinion.  And

13  if they are perspective is that it does apply to the

14  commercial client setting, you know we would like to

15  understand any documents that they have or what their position

16  from a testimony standpoint on that issue.

17        THE COURT:  Before I go there, doesn't it sound to

18  me like that is really a question of law in the sense of

19  whatever they have done, by way of compliance or setting up

20  protocols to comply -- it seems as though either they did

21  something or they didn't and it is up to the lawyers and the

22  Court to figure out whether it is in violation of that

23  opinion, advisory opinion.  I will hear you further

24  Ms. Lockner.

25        MS. LOCKNER:  Well, what we are trying to

1   understand, Your Honor, is if is their position that it

2   applies to the situation alleged in the compliant here.   Are

3   they saying that the 971 opinion applies to commercial

4   payments?

5              THE COURT:  Maybe we can get an answer now.  Go

6   right ahead counsel, Mr. Bushofsky?

7              MR. BUSHOFSKY:  Yes, sir.  Well Your Honor, I think

8   you are getting to the point.  This is no legal question and

9   what my client is going to be burdened to do here is search

10  for response to documents and this is if we are forced to do

11  what Ms. Lockner is asking, look for communications and

12  internal and external presumably with lawyers about the import

13  and coverage of the 971 opinion.  And since none of it is

14  going to be producible, because it is all going to be

15  privileged, log it and then let's all argue in front of Judge

16  Day for a long time about the privilege law again, what is on

17  it.

18             This is a complete red herring and this is more cage

19  rattling, Your Honor, in my view.  The 97 guidance speaks for

20  itself.  The insurance companies have a different opinion

21  about what it means than some other people.  The Court in the

22  Texas case that struck down CMS' rule making address the 97

23  guidance a little bit and in favor of patients and providers

24  frankly.  And so you know, Ms. Lockner under 97 opinion is not

25  necessarily something I think -- necessarily guides this

 1   analysis, this dispute or you know what my client should have

 2   to produce.

 3         I don't understand their theory necessarily to

 4   depend on the 97 guidance or compliance with it or non-

 5   compliance with it, so maybe I need some  more understanding

 6   about why that is necessarily relevant.  The 97 guidance

 7   didn't apply to patients on ACA plans or donations that ended

 8   up eventually in -- Court's  money spongeable and as

 9   Ms. Lockner has said multiple times, they can't follow the

10   money necessarily because my client never made those

11   conditions because that would be inappropriate and

12   inconsistent with its mission to treat everyone alike that has

13   this disease.

14         But you know, I just don't understand how if 97 --

15   if the 97 guidance supposedly isn't even applicable to the

16   Obamacare exchanges, why it is even relevant and why we should

17   be looking for it.  I just -- and I am not going to take a

18   position today on whether it is applicable and whether we were

19   compliant.  I don't see it as part of her case as I

20   understand.

21         THE COURT:  Well, did you hear that.  That was a

22   final lap bell.  I mean, we have about 9 minutes until we are

23   through whatever you want to work through but Ms. Lockner, you

24   have the floor.

25         MS. LOCKNER:  Your Honor, I think in my letter I

1  point out that they tell on their website, that the key to the

2  program is the strict firewall that separates donations to AKF

3  from determinations of case and eligibility for assistance.

4  And they have also changed their representations about 971 and

5  altered their HIPP guidelines.  So those are the things that

6  we are interested in getting information.

7           What is the -- the strict firewall?  The HIPP

8  guidelines and the changes to that?  We would like to see that

9  all of the changes and the various iterations of the HIPP

10 guidelines through this time period.  Because these have

11 changed since our lawsuit was filed.  So I am not asking for

12 about a bunch of privilege communications and I would be

13 willing to make accommodations in a privileged log for the

14 sake of finding some compromise too.

15          But there are I think a lot of non-privileged

16 information about changes to their guidelines, changes to

17 their policies and practices that are relevant and that I

18 think we are entitled to.

19          THE COURT:  Well, let me cut it to the chase in this

20 way, my leaning would be and I am glancing now at page 9 of

21 Robin Kaplan's memo to me where we talk about the HIPP program

22 et cetera.  My instinct was that seeking AKF's HIPP honor

23 system documents -- that is all documents I think would be far

24 too broad.  But you should be entitled to a fair share of

25 donations information would seem to be more appropriate there.

1  It sounds as though if you are looking for the document that

2  reflects what is there and any iterations over the years that

3  may be fine but getting every slip of paper on the program

4  doesn't I think move this thing along.

5          Let me also just skim a couple of my notes here to

6  help you further because both of you will have the green light

7  after this conference to file any motions that you may feel

8  appropriate and after you wrestle with it further.  Give me a

9  moment.

10         (Pause)

11         THE COURT:  Circling back a little bit and I am on

12  page 6 of the same memorandum.  There is a reference saying

13  that AKF also claims that this discovery is fully obtainable

14  from ARA and we are talking about producing documents -- maybe

15  we covered that.  Give me a moment.  Going down to page 7 of

16  the section dealing with United's prohibition of unauthorized

17  third party payments.  Talking about premiums and pre-paid

18  cards and money orders et cetera and then later on you say

19  that there are some documents that suggest that AKF was

20  directly involved in routing money to ARA patients in a forum

21  that was difficult for United to detect.

22         Is there something that I have not seen that gives

23  you belief that this occurred?  What are those documents? Can

24  you give some guidance there?

25         MS. LOCKNER:  And again Your Honor, once the

1   protective order on Exhibit A is signed, I can -- I will be

2   happy to share those.

3           THE COURT:  Fair enough.

4           MS. LOCKNER:  There are certainly what we may

5   have -- either there is indication -- once United made clear

6   that it was not accepting payments from the AKF, it made the

7   documents to show that ARA and AKF worked together to have

8   checks from AKF send to ARA to the name of the patient and

9   then the patient would deposit those and either use a money

10  order or their own personal checks and we understand that

11  there were some instances where they might have some sort of

12  prepaid credit card use as well.

13          MR. BUSHOFSKY:  Your Honor.

14          THE COURT:  Go ahead.

15          MR. BUSHOFSKY:  This is one of those instances where

16  either through a lack of information or background in a

17  particular issue or strategy someone is looking at something

18  in broad daylight and saying that it is some kind of scheme or

19  concealment or conspiracy.  The --- client attached to it a

20  complaint, the HIPP guidelines from my client that had stated

21  for years and years that if an insurance company can't or

22  won't for technical or other reasons or any reason, accept

23  direct premium assistance from AKF or its needy patient, AKF

24  will do what it can to serve those beneficiaries by just

25  giving them the money directly.

1              So what is happening now is and this is one of the

2    basis of my case against insurance companies down in Louisiana

3    in Federal Court in Baton Rouge where Aids and HIV charities

4    were at issue.  They want people off their rolls who are sick

5    and poor if they can do it.  And then makes it difficult if

6    the folks are just taking money out of their own bank accounts

7    or going down to the currency exchange and writing a check to

8    United Healthcare.

9              And so they want to take it a step further and start

10   asking people, well where did your money come from that you

11   paid your premiums with?  And if they came from AKF, they have

12   a problem with it.  That might make it more difficult for them

13   to figure out where the money came from.  I think the health

14   care insurers have all sorts of First Amendment problems and

15   other privacy problems and discrimination problems if they

16   demand to know where someone's cash is coming from that is

17   paying for insurance premiums.

18             But be that as it may, my client has always been

19   transparent.  So they are going to send their beneficiaries

20   the grant that they are entitled to that they applied for and

21   that they need to keep their life saving dialysis going.  Even

22   if the insurance company won't take it directly.  What a

23   scheme, what a conspiracy this is.  It is not under the cover

24   of night.  It is out there open as day.  And here is the punch

25   line on this issue.  These insurance companies gladly took

1   this money from AKF for years and years until the law changed

2   such that they cannot charge more in premiums for people who

3   have prior existing conditions.

4           Now, they don't like it, they are pointing to some

5   old language that is in their policies or they are adding

6   language to policies that says for all sorts of reasons, we

7   don't take money from third parties to pay for our customers'

8   insurance.  And if you try -- and they are having people sign

9   documents to say that they didn't get it from you know -- I

10  don't know if United has done that but some other insurance

11  companies have done that.  I don't know if that is appropriate

12  or not, I am not going to take a position it.

13          But what I am telling you, Your Honor and we can

14  give you the exhibit from Ms. Lockner's complaint that shows

15  that this is out in the open and completely transparent and

16  they don't need to put discovery into  because it is not in

17  dispute.  They don't need to find out that we do it.

18          MS. LOCKNER:  Your Honor, there is -- we have

19  contracts that prohibit that kind of payment and ARA knows it

20  and AKF knows it and they went ahead and tried to conspire

21  together to evade that and breach that -- and have their own

22  patients breach the contract with United.  Now, if they are so

23  transparent, then this really should be easy dispute, we

24  should get whatever we have asked for in that regard and

25  Mr. Bushofsky and or ARA and I can fight about what it means

 1  later.  But it doesn't sound like there is any concern there

 2  that they are more than willing to --

 3          MR. BUSHOFSKY:  Of course there is a concern.

 4          THE COURT:  Let me interrupt because I think I have

 5  just about timed out on what I can do for you today.  I do

 6  have two other observations that I -- my leanings are against

 7  requiring any kind of disclosure about the top five anonymous

 8  donating providers identified in AKF's tax returns.  And I do

 9  want to ask about this -- are you at liberty at this moment to

10  say whether or not Mr. McDonough took the Fifth during his

11  deposition on a repeated basis?  Was that he a --

12          MS. LOCKNER:  He did not plead the Fifth, Your

13  Honor.  And he does have some information that I would like to

14  share that I think would helpful in sharing why we need more

15  information from the AKF.  But again I need the protective

16  order signed by  Mr. Bushofsky and sign Exhibit A, I am not

17  able to read this much more than that.

18          THE COURT:  I understood.

19          MR. BUSHOFSKY:  We have signed Exhibit A.

20          THE COURT:  Well, it looks like something is afoot

21  and you all are making some progress so that we can have some

22  more meaningful discussion on much of this.  Let me ask you

23  what -- there is a lot that is difficult in these telephone

24  conference calls because of -- I have to end up stepping on

25  conversations that I probably wouldn't have to do the same way

1    in person.  Do you find this better for your respective

2    clients?  Or do you feel better with an in person

3    presentations?

4              MR. BUSHOFSKY:  Your Honor, even though it is a

5    travel for me and Ms. Lockner, obviously, I think that an in

6    person in camera meeting would be helpful.

7              MS. LOCKNER:  I agree with that, Your Honor.

8              THE COURT:  Okay, well in the future, should we have

9    the need for these kind of discussion that we suspect would be

10   more than an hour in duration, then speak up and I will be

11   glad to deal with it in person.  Because as we all know most

12   of our communications is not verbal.  So I must bow out now.

13   But I will tell you that you have satisfied your procedural

14   obligations with this Court to the extent that anyone wishes

15   to file a motion, would it be helpful to the parties if I put

16   a deadline on such?

17             MR. BUSHOFSKY:  Your Honor, for the American Kidney

18   Fund, it is Jeff Bushofsky, I would ask -- I would actually

19   propose something that is maybe the opposite or the inverse of

20   a deadline.  A cooling off period I think maybe.  Not that

21   things got too heated or unprofessional today -- not at all.

22   But what I would like to do for my client is study the

23   transcript, pay closer attention to Your Honor's statements on

24   the records, they give us some insight into your leanings.

25   Look at what Ms. Lockner said, look at what I said frankly

1  because sometimes I forget as I am saying it.

2          And meet with Ms. Lockner at least one more time to

3  see if we can provide each other some proposals or counter

4  proposals and maybe take care of this before the need for

5  motion practice.  I think we have time to do it now that the

6  Florida litigation deadlines have been moved out and extended

7  into the winter.  And we also need to look at this McDonough

8  stuff to see what could be relevant and lead us to maybe

9  loosen our objections on a couple of things.

10          I also wanted to talk to her about two issues that

11  we didn't have before Your Honor today, at least not directly.

12  One is who is going to pay for this if it does turn into a big

13  expensive review and production if we can come to some

14  accommodation and the wall that we would like to see in place,

15  not just attorney's eyes only but making sure that the darn

16  attorneys who are working for other insurance companies and

17  lobbying for those insurance groups, that aren't actually

18  involved with the ARA litigation down in Florida.

19          THE COURT:  Okay.

20          MS. LOCKNER:  Your Honor, I guess -- I think

21  generally I think that kind of makes sense(sic) and I think it

22  is important for us to have a chance to try to do some

23  meeting and conferring after I am able to be a little more

24  forthcoming with the information that I have.  If you do have

25  a minute, Your Honor, I wouldn't mind getting your take on

1   this idea that we should have some sort of wall as lawyers.  I

2   mean, we have a protective order.  And Mr. Bushofsky is

3   wanting to take -- he doesn't want to have a protective order

4   applied to what AKF will be producing, he wants something

5   different.  I said that we can fight about that at a later

6   time but the idea that my firm should somehow be limited and

7   not be able to either represent other people or -- it is

8   concerning to me obviously and there is no -- he put that in

9   his letter and there is no case law to support it.

10          We obviously would -- even within this case, I can't

11  share certain things with my client because they are attorneys

12  eyes only.  That -- we do that all the time.  I take that

13  directive very seriously which is why I stop --- to try to get

14  this other protective order modified.  So the idea that we

15  would be sharing information with one client relating to

16  another client, we simply don't do it.  And the assumption not

17  only is insulting but is not one that is a practical way for

18  us to practice.

19          So I think that that request is -- we are going to

20  find ourselves in front of Your Honor if we can't craft or get

21  some guidance on that.  If we have to, we do but I -- going

22  back, I do agree with the idea that Mr. Bushofsky and I should

23  take some time and meet and confer and then really kind of

24  narrow the issues where we can find agreement and then the

25  areas of disagreement remain to figure out a way to put that

1    in front of Your Honor.

2         THE COURT:  Okay so dealing with the first thing

3    first.  It may be appropriate to set in a date for sort of a

4    status conference to give the counsel -- something, a date to

5    move toward because as a successful, you obvious do well with

6    deadlines but more importantly to talk through if I can be

7    helpful, any issues that are remaining and to just keep my

8    finger on the pulse.  And I am not trying to drive this case

9    but I don't want it to drift too far away and then become

10   unmanageable from my end.

11        As to the limitation -- attorney's eyes only and

12   things like that, I am ordinarily very open to those kinds of

13   agreements but I have been alerted by Mr. Bushofsky about some

14   of the concerns that are spilling over from one litigation to

15   the next to the next to the next.  I am not prepared to of

16   course making kind of ruling on anything like that but --

17   there are certainly -- there are aspects of this case that can

18   be considered confidential or for attorney's eyes only or for

19   the litigation team only is probably a better way of saying

20   it.

21        But I am sensitive to this concern.  I am not ruling

22   one or leaning one way very clearly.  But it is intriguing to

23   me whether this is a kind of a -- as AKF would describe it, a

24   national conspiracy to get it or something far less than that.

25   Maybe United would describe it as sort of an idea that

1    everybody is out to get them but it is fanciful.

2             So I don't know that I can give you any real clear

3    guidance, Ms. Lockner at this time.  But it is something that

4    I am going to struggle with.

5             MS. LOCKNER:  Understood, Your Honor.

6             THE COURT:  Okay.  Well, I appreciate your efforts

7    and your submissions and your arguments of course.  Any ideas

8    about when we would like to have another just discussion about

9    some things at this point?  You think in a month?  Two months?

10            MS. LOCKNER: I know that Mr. Bushofsky and I

11   recently got back from vacation and I don't know if he is

12   having any better luck than I am digging out but if we could

13   meet sometime -- well first of all, Your Honor, if we could

14   get you that protective order hopefully later today and if

15   that could be signed, that would free us up to exchange some

16   things sooner than later.

17            And then if we could try to meet sometime in the

18   next week or maybe the latter part of next week or have a

19   status conference the latter part of next week or perhaps

20   right after the Labor Day weekend?  Does that make sense?

21            THE COURT:  Well, I don't know that you are going to

22   have everything to review that you want to by then but how

23   about this, whenever you want me to sign off on some documents

24   that you got there, feel free to send an e-mail to my chambers

25   so that we can catch it.  Because right now I am down one

1  third of my staff for at least the balance of this week and

2  trust me, this is a crazy week but I am thinking a conference

3  call and status might be appropriate maybe about 30 days out

4  unless you think that is too much time?

5         MS. LOCKNER:  Yes, Your Honor, this is Ms. Lockner,

6  I think that will be way too long.  Although the scheduling

7  order has been bumped out a little bit, we still have experts

8  disclosures that are actually due before the end of discovery

9  deadline.  So we would like to keep things moving far more

10 quickly and if we can't get something resolved in the next two

11 weeks at the very latest, we would want to be having, I think

12 motions going at that point so that we could at least have

13 some hope of getting something by the end of September or

14 October.

15        MR. BUSHOFSKY:  Well, Your Honor, I thought that 30

16 days out was reasonable and that is what I was going to

17 suggest.  We have an intervening holiday.  We have to get the

18 transcript from Your Honor and hopefully Ms. Lockner agrees

19 with me that that would be helpful to review from today's

20 discussion.  I really think that that is a good starting point

21 in addition to the letters.  And maybe more so for a

22 discussion between she and me.  And I can't proport to make

23 your reporter to move any faster than he or she normally does.

24 And wouldn't want to and I don't think a case with a late

25 December cut off which may well move again, it is certainly

1   not going to get shorter is a reason to have a little bit of a

2   fire drill.

3           And I am in Delaware next week.  Delaware --- for

4   argument.  So realistically I can probably get the transcript,

5   think about these things, consult with my client.  Have a sit

6   down with Ms. Lockner, within the next three weeks making 30

7   days out completely reasonable for a time to touch base with

8   Your Honor.

9           MS. LOCKNER:  Your Honor, we served the subpoena

10  almost three months ago now and like I said our expert

11  disclosures are November either 1st or 3rd.  And so we would

12  need information definitely early October at the latest.  And

13  I think that time period is you are talking then end of

14  September before we even start talking about motions and is

15  not going to be helpful.

16          THE COURT:  Well, I can look at something as early

17  as 7th or 8th of September.  It is a pressure packed calendar.

18  And if it is a status conference I would have to limit that

19  discussion to no more than an hour and I have to find an hour

20  to make that happen.  Tell me about your 7th of Septembers?

21          MS. LOCKNER:  The afternoon is wide open for me,

22  Your Honor.  And the 8th works as well.

23          THE COURT:  I failed to mention my morning is

24  consumed and my afternoon will be affected.  But I can

25  probably give you something maybe 3:00 or 4:00 on eastern

1   time?

2           MR. BUSHOFSKY:  Your Honor, I want to be in Maryland

3   for the status conference if that is what Your Honor is

4   suggesting.

5           THE COURT:  Oh I didn't think it that necessary, I

6   thought we could do this by phone.

7           MR. BUSHOFSKY:  Okay yes, but as it is, I have an

8   all day hearing in another matter.

9           THE COURT:  Okay and would that be true for the 8th

10  as well?

11          MR. BUSHOFSKY:  I am looking, Your Honor.

12          THE COURT:  Okay.

13          MR. BUSHOFSKY:  The 8th looks better but I have some

14  serious concerns about our ability to get the transcript and

15  Ms. Lockner and myself to sit down.  I just -- I am having a

16  hard time understanding what the real difference is going to

17  be here between 3 weeks and 4 weeks but we can try it.

18          THE COURT:  I am -- I am willing to try it, we can

19  always move it if you think it would be not worth our time,

20  all it takes is a joint memo from the two of you to my

21  chambers saying we have talked and we don't think it is

22  helpful at this hour to talk further with the Court.  I

23  certainly love getting some of my life back as opposed to

24  always losing it.  But if I heard you correctly, the afternoon

25  of the 8th might work for you?

1          MS. LOCKNER:  The whole day works for me, Your

2    Honor, whatever works best for you.

3          MR. BUSHOFSKY:  Your Honor, for AKF that day does

4    work.  I maintain the concern but we will get back to you in

5    advance if like we haven't been able to get all the stuff that

6    we need to have a meaningful discussion.

7          THE COURT:  That is fine.  I am going to put it down

8    for September 8 at 3:00 p.m. eastern standard time and if

9    there is anything that you all can send me, a page or two in

10   advance of that, that is of interest, fine.  It doesn't have

11   to be jointly.  Though in fact, why don't I do this, I will

12   ask you to by noon on the 7th in the -- in your individual or

13   your joint one or two page statement of where we are and where

14   we need to go.  And that will make our time hopefully more

15   beneficial so I won't spend the entire time with trying to

16   catch up.

17         But let's not plan on spending more than an hour

18   together.  Hopefully less and we will take it from there.

19         MS. LOCKNER:  Okay thank you so much, Your Honor,

20   for your time and all of your guidance.

21         MR. BUSHOFSKY:  Thank you, Judge Day, I hope you had

22   a good weekend in Chicago a couple of weeks ago.

23         THE COURT:  I did.  And I thank everyone who got the

24   weather straight and the party right for me.  It was good.

25   But I will tell you that I am not very happy with your Palmer

lnc

1  House Hotel even as historic as it is.  That place, it needs a

2  remake -- a redo.

3          MR. BUSHOFSKY:  We don't recommend it, Your Honor, I

4  wish you had asked me.  We could have gotten you a rate in a

5  nicer hotel that is kind of in the neighborhood as well.  Next

6  time.

7          THE COURT:  Oh okay.  Well I thank you all for your

8  time and attention and I did enjoy Hamilton by the way.  So.

9          MR. BUSHOFSKY:  That is good.  You can't complain

10  about Hamilton.

11          THE COURT:  So until next time, you all have a great

12  weekend.

13          MS. LOCKNER:  Thank you, Your Honor.

14          MR. BUSHOFSKY:  Thank you, Your Honor.

15      (Whereupon at 12:20 p.m., the telephone conference

16  concluded.)

17

18

19

20

21

22

23

24

25  Keynote:  "---" indicates inaudible in transcript.

<u>C E R T I F I C A T E</u>

      I certify that the foregoing is a correct transcript

from the duplicated electronic sound recording of the

proceedings in the above-entitled matter.


*Lisa Contreras*    *8/28/2017*
Lisa Contreras          Date
Certified Transcriber
Certificate No. CET**D-474